# Greg Thorpe



*Professional Experience*

**2002-Present Horse Ranch, ███████ Ar.**

Currently involved with the selling, showing, training, and breeding of quality Registered Missouri Foxtrotting Horses.

**1978-2002 Senior Executive Sales Representative**

**GlaxoSmithKline**

**Colorado Springs, Co**

Managed Cerenex Division (CNS) in Colorado Springs, with over $5 million/year in detailed products. Responsibilities included all primary care physicians and neurologists/psychiatrists. Sales presentations included in-services, speaker programs, and direct product presentations to physicians, pharmacists, hospitals, managed care branches, and other ancillary medical providers. My product line included Imitrex, Amerge, Wellbutrin SR, Zyban, Lamictal and Valtrex. All products were growing at rates above the nation and region. Formerly Glaxo Inc., then Glaxo Wellcome, and now GlaxoSmithKline, this company has undergone incredible growth, and I have contributed significantly to the success we now share. I have sales experience in a wide range of therapeutic categories, including anti-infectives, respiratory, antihypertensives, anti-inflammatories, ulcer medications, antiemetics, antifungals and steroidal products.

Over the years, I have always been a top performer, receiving many company awards and recognition. At one point I covered half of the state of Colorado, from border to border south of Denver, with some area in Kansas and New Mexico.

**1976-1978 Professional Sales Representative**

**Mallinckrodt Pharmaceuticals**

**Wichita, Ks.**

Managed large territory based in Wichita, Kansas and traveled most of Kansas. My key responsibilities included selling and marketing of prescription pharmaceuticals to physicians, retail pharmacies, and hospitals. I created the top performing territory in the nation in a three-year period, and was named Sales Representative of the Year in 1977. I left Mallinckrodt when they were purchased by Wallace Laboratories, for the opportunity to obtain employment with Glaxo Inc.

**1973-1974 Inhalation Toxicologist**

**Bio-Test Laboratories**

**Decatur, Il.**

Leader of six member unit running inhalation studies on various chemical compounds, coded only, to test for safety in animals prior to later phase studies in humans as pharmaceutical products to be marketed. Followed specific protocols, performed sub-acute studies in primates, wrote reports on outcomes to be submitted to the FDA.

## *Education*

**1975** Postgraduate studies (Biology, French)

Vincennes University, Paris France

**1973** Bachelor of Science

Eastern Illinois University Charleston, Illinois

Major: Zoology

Minor: Physiology/Physical Education

**1969** Graduate-Litchfield High School

Litchfield, Illinois

## *Awards*

Presidents Club, Glaxo Inc. (3 times)

Sales Representative of the Semester/Quarter (12 times)

District Sales Trainer

Sales Representative of the Year, Mallinckrodt Pharmaceuticals 1977

Letterman, Eastern Illinois University, Football (2), Wrestling(4) and Track(2)

Wrestling scholarship-Eastern Illinois University

Illinois All-State Football, Running Back, L.H.S.

Illinois Midstate Conference Wrestling Champion, L.H.S.

## *Memberships*

Pikes Peak Pharmacy Society

Eastern Illinois University Letterman's Club

Woodland Park Saddle Club

N.A.U.I.

N.R.A.

Missouri Foxtrotting Horse Breed Association

Twin Lakes Gun Club

## *Personal*





Hobbies Horses, fishing, hunting, scuba, backpacking, and sports.

***References*****-----Available upon request.**

## FIELD COACHING REPORT

DSM must complete FCR at the end of each worktrip.

GlaxoWellcome

| Report # | FCR #1 | FCR #2 | FCR #3 | FCR #4 | FCR #5 | FCR #6 | FCR #7 | FCR #8 | FCR #9 | FCR #10 | Avg. Score |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Overall Rating | 2 | 2 | 3 | 3 | | | | | | | 3 |
| Worktrip Date | 02/06/01 | 04/19/01 | 06/20/01 | 09/17/01 | | | | | | | |

### PSR INFORMATION

Exceptional 1; Exceeds Standards 2; Fully Effective 3; Needs Development 4; Unsatisfactory 5

| PSR NAME | Greg Thorpe | | Behavior | Weighting | Score | Weighted Score |
|---|---|---|---|---|---|---|
| Worktrip Date | 09/17/01 | | Professionalism | 10% | 3 | 0.30 |
| Territory # | B4EN15 | | Territory Management | 10% | 3 | 0.30 |
| DSM | Pat Keith | | Customer Service | 10% | 3 | 0.30 |
| Division | Cerenex | | Product Knowledge | 20% | 3 | 0.60 |
| Region | B4 | | Selling Skills | 20% | 3 | 0.58 |
| Products | CNS | | Sales | 30% | 3 | 0.90 |
| | | | OVERALL RATING | FULLY EFFECTIVE | | 3 |

**ATTENTION: Each of the 6 behavior categories must have a score to accurately compute the Overall Rating.**

**You must enter a value in at least 1 box in each category.**

For Professionalism & Territory Management, select either MEETS PERFORMANCE STANDARDS or NEEDS DEVELOPMENT.

| PROFESSIONALISM | Meets Performance Standards | | | Description (Refer to Performance Standards for full description.) |
|---|---|---|---|---|
| Core Values | ☑ Meets Performance Standards | ☐ Needs Development | Exercise good business judgement and adopt corporate core values. |
| Follows Policies & Procedures | ☑ Meets Performance Standards | ☐ Needs Development | Comply with all company policies. |
| Integrity and Initiative | ☑ Meets Performance Standards | ☐ Needs Development | Represent GWI in a manner that never places a patient at risk. |
| Respectful to Employees | ☐ Meets Performance Standards | ☑ Needs Development | Exercise patience and understanding when working with employees. |
| Respectful to Customers | ☑ Meets Performance Standards | ☐ Needs Development | Treat office staff professionally, keep commitments, follow-up promptly, and project positive image. |
| Responsibility and Accountability | ☑ Meets Performance Standards | ☐ Needs Development | Take ownership of business and represent GW in professional manner. |
| Teamwork | ☐ Meets Performance Standards | ☑ Needs Development | Effectively work with counterparts to maximize sales & share. |
| **TERRITORY MANAGEMENT** | **Meets Performance Standards** | | Description (Refer to Performance Standards for full description.) |
| Days in the Field | ☑ Meets Performance Standards | ☐ Needs Development | Expected to work full field sales days. Standard Hours of Operation: 8:30 - 5:00. |
| Samples & Storage | ☑ Meets Performance Standards | ☐ Needs Development | Follow company sample policy and distribute appropriately and fully to drive share. |
| Reach & Frequency | ☑ Meets Performance Standards | ☐ Needs Development | Meet or exceed company expectations with prescribers and pharmacies. |
| Reports, Correspondence | ☑ Meets Performance Standards | ☐ Needs Development | Business plans updated regularly. Expense reports completed and mailed on time. |
| Communication | ☑ Meets Performance Standards | ☐ Needs Development | Effectively streamline Email, Voice Mail, & Paper Mail. Transmit daily. |

**Use this 5 point scale to evaluate Customer Service, Product Knowledge, Selling Skills, and Sales Performance.**

Exceptional = 1,  Exceeds Standards = 2,  Fully Effective = 3,  Needs Development = 4,  Unsatisfactory = 5

| CUSTOMER SERVICE | | 3 | Description (Refer to Performance Standards for full description.) |
|---|---|---|---|
| Customer Related Investments | | 3 | Align resources, activities, and sales time around key customers. |
| Educational Programs | | 3 | Enhance customer support by educating key physicians. (i.e. Preceptorships.) |
| New Product Launch Efforts | | 3 | Ensure effective product introductions through deliberate strategies. |
| Cross Departmental Solutions | | 3 | Team with counterparts in other key areas. (i.e. National Accounts, Managed Care.) |
| Contract Specialist | | 3 | Represent the company portfolio. Work with HMD counterparts to sell contracts. |
| **PRODUCT KNOWLEDGE** | | 3 | Description (Refer to Performance Standards for full description.) |
| Total Product Knowledge | | 3 | Mastery of GW and competitive product knowledge is expected. |
| Third Party Support | | 3 | Familiarity with significant studies and approved third-party resources to support product benefits is expected. |
| Pricing & Reimbursement | | 3 | In-depth knowledge of pricing with GW products and competitors is expected. |
| Continual Education | | 3 | Each PSR should strive to become a true product resource. |
| **SELLING SKILLS** | | 3 | Description (Refer to Performance Standards/E.S.P. program for full description.) |
| Total Office Call | | 3 | Focus on Prescriber, Nurse, and all Office Staff to maximize selling opportunities. |
| Call Planning | | 3 | Who? Why? What? Where? When? Target effectively. |
| Open the Call | | 3 | Create interest. Build rapport & credibility. Establish an agenda. Establish a time frame. |
| Identify Selling Opportunities | | 3 | Ask appropriate/targeted questions. Listen for needs. Review your understanding. |
| Present Features & Benefits | | 3 | Paint patient pictures and use visual reinforcement. Effectively deliver core messages. |
| Test Readiness to Commit | | 3 | Handling the indifferent customer. |
| Solve Customer's Concerns | | 3 | Clarify, acknowledge, & address. |
| Gain Commitment | | 3 | Ask for the business. |
| Bridge to the Next Product | | 3 | Strong, seamless, and smooth transition will create more time with physician. |
| Analyze the Call | | 3 | Effective? What went well? How to improve for next call? Objective for next call? |
| Establish Relationship | | 2 | Ability to build a positive, long-term relationship with the physician. |

| SALES PERFORMANCE | | | Scale: Performance Based on Power Rating | Scale: Performance based on Territory Dynamics (Check 1 box only.) | |
|---|---|---|---|---|---|
| QTD Power Rating % | 98.00% | 1 | 105 & above | ☐ 2: Exceptional Contribution to Territory | |
| Sales Performance Score | 3 | 2 | 102 - 104.9 | ☐ 1: Major Contribution to Territory | If Territory Dynamic Factor is used, explanation must be described in the comment section on page 2. |
| Territory Dynamics Factor | 0 | 3 | 98 - 101.9 | Equitable Contribution to Territory | |
| OVERALL Sales Performance Score | 3 | 4 | 90 - 97.9 | ☐ -1: Minimal Contribution to Territory | |
| QTD Power Rating Time Period through month of: | May | 5 | 89.9 & below | ☐ -2: Adverse Contribution to Territory | |

For In-depth Sales Summary, see latest Power Report.

# FIELD COACHING REPORT - Page 2

Greg Thorpe     09/17/01     GlaxoWellcome

Note: This page allows you to edit text (change font type, font size, bold, and make new paragraphs). You cannot use the tab function or bullets. Keep comments limited to the space in each box. This page is designed for brief, concise comments. If additional comments are needed, attach a sales memo using a Word document. Caution: Don't type below end of space provided; text cannot be viewed.

**COMMENTS - SALES PERFORMANCE**   Explain key issues and drivers that are affecting share & share change.

June numbers reflect the following:
Migraine-cmty:71.6  matty:71.6
Wellbutrin SR-cmty:9.9  matty:9.2
Valtrex-cmty:65.5  matty:61.8
Migraine has leveled off, and hopefully is making a positive turn. WSR continues to show strong growth. Valtrex is performing at a very high level. This product is a success story. Continue to focus on pushing the top Zomig prescribers to choose one of the 3 formulations of Imitrex. Your presentation against the ZMT using the PI is very impactful. This is the type of aggressive approach that needs to be taken with each target.

**COMMENTS: IDP/Progress/Status Update**

Developmental objectives moving forward:
Utilize your experience to help other district members increase their skill set.  (present info. At district meetings, etc.) You gave a presentation at the RBU meeting on selling vs. the melt tabs.

Focus on achieving 8+ physician calls per day/ 2 pharmacies per day. As of this report you have a 8.02 calls per day average

Focus on transmitting daily for 2001. Transmission has been as required

Work with TSR, to assist with territory dynamics, introductions, rapport building, etc. Utilize existing rapport to assist counterpart. Working relationship with TSR is not where it needs to be.

Note: Are there any areas of skill, knowledge, behavior, or results that have been marked on page 1 (or on previous reports) as "needs development", that are of such a serious nature due to: 1) the degree of the deficit, and/or 2) the seriousness of the action, and/or 3) the lack of suitable progress toward improvements, that without immediate corrective action will necessitate the manager to begin the formal discipline process?
If YES, please explain in the comment section below:               ☐ YES    ☑ NO

**COMMENTS - OTHER:**   Describe performance and include examples of activities and behaviors observed during the work trip.
(If or any score other than a 3, briefly describe specific reasons why this score was given.)

Team work is essential in your position.  As we have discussed, it is critical that you coordinate with all of your counterparts to drive your business.  You have made comments that indicate that you and the TSR, Ron Cruz, are not working well together.  You have had some problems with Jim Butler, your BW counterpart as well.  Working together is not a part of the job that is optional, it is required, and very necessary.  I would ask that you focus moving forward, on working toward a strong working business relationship with both of these individuals.  Teamwork is a critical part of this job, and not getting along with your counterparts can adversely effect the business in a territory.  I expect to hear positive feedback regarding this area moving forward.  I would ask that you focus on creating a more positive working environment in the territory between yourself and all counterparts.  As a senior executive representative, you need to take the lead on building this team environment.

I have asked that you contact fleet immediately to report a dent in your vehicle, as well as to clear up an outstanding accident repayment issue. You called fleet while I was with you, and I will await the response that you get.

Based on Junes numbers, it appears that migraine has started to turn in a positive direction. As we discussed, there are some key individuals who are not supporting our products the way that we expect them to.  Dr Lesh is a physician who you have established a strong business rapport with, yet he is the largest Zomig prescriber in the territory.  It is critical that we turn this in our direction, asap.  I would ask that you keep me updated on your actions with him.

The migraine numbers appear to be taking a positive turn, focus on driving this market share trend.  Use the business rapport that you have with the key targets to ask them for the business. Dr. Roberts is certainly on our side.  It was great to finally meet him.  He is our biggest supporter in your territory, and a real key to driving migraine in the area.  He is also speaking for us on a regular basis.  I am glad to see that you have worked to develop him as a lunch and learn speaker, as well as a speaker at larger events.

**EXPECTATIONS FOR NEXT WORK TRIP**   For employee comments, attach a sales memo using a Word document.

Update me on action steps for building stronger business working rapport with TSR, and BW counterparts.

Update me on progress with Dr. Lesh, and the Bjork neurology group.

Focus on asking for the business on each call.

Try to set a lunch with Dr. Roberts.

VERSION 1 (Updated: 10-30-00)

| PSR Signature & Date | DSM Signature & Date |
|---|---|
| Greg Thorpe | Pat Keith |

PSR files Electronic Copy  ■  PSR sends signed Hard Copy to DSM  ■  DSM keeps signed Hard Copy on File  ■  DSM sends Electronic Copy to RSD



**DATE:    10/1/01**

**TO:**      Greg Thorpe                         **cc:**Mike Bennett
                                                            Carrie Rubright

**FROM:**    Pat Keith

**SUBJECT:    VERBAL WARNING -**

*This memo is a written confirmation of the verbal warning you received informing you of required performance improvement and to outline specific steps to improve your performance. This letter will not be placed in your official employee file, unless you fail to improve your performance and receive additional discipline.*

As determined from our previous conversations specifically in March, August and most recently September.  Your performance is unsatisfactory for the following reasons

- You have reacted inappropriately to constructive feedback from management. This has been done through e-mail, and voice mail. An example of this is your recent voice mails rebutting your ratings for teamwork that appeared on the Sept. 18 coaching report.
- You have had a negative attitude that has effected your team members in the territory. Your team members have shared that your overall attitude regarding the company has inhibited their ability to work with you. You have made numerous negative comments pertaining to your TSR counterpart (Ron Crews), in the presence of management.
- You have consistently challenged directives given from management, as well as questioning new programs, guidelines, etc. This has been done verbally, through e-mail, and voice mails. An example of this, is the March monthly report, in which you made negative comments about the new incentive compensation program that had not yet been rolled out. You also stated in your August monthly report that you see no value in the monthly report that is required.
- On March 2, 2001 you were advised that your negative reactions to situations, were not appropriate, and would not be tolerated, moving forward. You were informed that you are expected to have a positive attitude in your approach to your daily activities, as well as your interactions with peers, home office personnel, etc. You acknowledged that you did not react appropriately in either of the referenced situations, and that you were aware of the expectations of you as a sales representative in the new GSK.

The following outlines specific steps that are required and will be evaluated during your verbal warning period to measure your improvement.

1. You will exhibit a positive approach to your daily activities.
2. You will not send e-mails, or voice mails, rebutting directives from the company, or questioning incentive compensation programs, company guidelines/policies, etc.
3. You will make an effort to create a positive working relationship with all 3 of your team members. This will include no longer making negative comments toward your team members.
4. You will conduct yourself in a professional manner when dealing with GSK team members, as well as GSK customers.
5. You will discontinue making negative comments regarding the company. This will include incentive compensation plans, salary structures, guidelines, policies, directives, and personnel.

You have up to a maximum of 30 days to demonstrate immediate and sustained improvement. We will have a follow-up, evaluation meeting on or before _11/2/01_____. If there is no improvement or if your performance deteriorates at the end of this period, you may receive a written warning or be separated from employment. Should your performance improve and, at a later date, should the same or similar problem occur, the company may immediately place you on written warning or separate you from employment. I suggest you review the company's corrective action policy outlined on the GSK Intranet.

The issues outlined in this letter as well as in our performance discussions are confidential and should not be discussed with your peers or customers.

If you have any questions concerning this verbal warning, please feel free to discuss them with your Human Resource Manager, or me. Remember that the company maintains a confidential employee assistance plan and you are always able to discuss issues with their staff.

Greg, I want your commitment to put in the required time and effort to improve. This can not be a temporary improvement. Greg, you have my support and I will help in any way I can. I trust that you can improve your performance, and I look forward to a very productive working relationship.

Pat B. Keith


District Sales Manager

## Glaxo Wellcome Inc.
## Glaxo Wellcome Cash Balance Plan Enhancement

### General Release Agreement

In consideration of the offer set forth in my Personal Benefit Statement and the summaries for the Glaxo Wellcome Cash Balance Plan Enhancement and the Severance Component of the Glaxo Wellcome Cash Balance Plan Enhancement, as well as the following:

- An additional lump sum payment of $11,000, less applicable withholdings, to assist in the purchase of your Company-issued vehicle;
- Up to $80,000 in reimbursement for any relocation expenses incurred similar to those made available through the GSK relocation program,

I, _____, on behalf of myself, and on behalf of my heirs, successors and assigns, hereby agree to release GlaxoSmithKline("GSK" or "the Company"); all of its past and future owners, subsidiaries, affiliates, directors, officers, employees, agents, and representatives; and all of the respective heirs, successors, and assigns of the foregoing (hereafter referred to together as "releasees") from any and all claims, demands, actions, and liabilities, whether asserted before now or not, that I might otherwise have asserted arising out of my employment with GSK, including the circumstances of the termination of my employment.

I also promise not to sue any of the releasees based, in whole or in part, on any claims, occurrences, or events relating to my employment with GSK or the termination of that employment. However, I am not releasing my rights, if any, under any qualified employee retirement plan, or under any applicable worker's compensation statute, or any rights or claims that may arise after the date on which I sign this General Release Agreement (also referred to as the "Release"). Those rights, and only those rights, survive unaffected by this Release.

I understand that as a consequence of my signing this Release I am giving up, with respect to my employment and the termination of that employment, except as provided in the paragraph above, any and all rights I might otherwise have, whether heretofore asserted or not, including but not limited to any and all rights I might otherwise have under

(1) the Age Discrimination in Employment Act of 1967, as amended;
(2) any and all other federal, state, and local laws, including but not limited to laws prohibiting discrimination in employment on the basis of sex, race, national origin, religion, age, handicap or disability, or other unlawful factors,

-1-

(3) any and all theories of contract and tort law, whether based on common law or otherwise; and

(4) any contracts or agreements.

I acknowledge and agree that this General Release Agreement is written in language that I understand and that I fully understand and appreciate the consequences of my signing this General Release Agreement.

I acknowledge and agree that the benefits I will be receiving under the Glaxo Wellcome Cash Balance Plan Enhancement and the Severance Component of the Glaxo Wellcome Cash Balance Plan Enhancement, the other additional benefits specified on the Personal Benefit Statement, and those listed above, constitute consideration over and above any benefits that I might be entitled to receive without executing this Release.

I acknowledge that, as a general matter, the Company always reserves the right to amend or terminate the benefits programs it sponsors. I specifically acknowledge that the Company has reserved that right under Elements of Choice: The GSK Flexible Benefits Program (the "Program") (including the Post-Retirement Benefits Program, the Medical Plan, and the Dental Plan), that the Program may be changed or terminated at any time, for any reason, and that certain of the benefits that I might receive under that Program in the future may be changed or terminated.

I also acknowledge and agree that:

A. GSK advised me in writing (in my Personal Benefit Statement, the summaries for the Glaxo Wellcome Cash Balance Plan Enhancement and the Severance Component of the Glaxo Wellcome Cash Balance Plan Enhancement, and elsewhere) to consult with an attorney of my choice prior to signing this Release.

B. I was a given a period of at least 45 days within which to consider this Release.

C. GSK has advised me of my statutory right to revoke my acceptance of this Release at any time within seven (7) days of my signing this Release.

I warrant and represent that my decision to execute this Release was (i) entirely voluntary on my part; (ii) not made in reliance on any inducement, promise or representation, whether express or implied, other than the inducements, representations and promises expressly set forth herein; and (iii) did not result from any threats or other coercive activities to induce acceptance of this Release.

If I decide to exercise my right to revoke within seven (7) days of my acceptance of this Release, I warrant and represent that I will: (i) notify GSK in writing of my intent to revoke my acceptance of this Release; and (ii) simultaneously return any consideration I have received from GSK by the time of revocation.

-2-

I further warrant and represent that I fully understand and appreciate the consequences of my signing this Release.

IN WITNESS WHEREOF, I hereby execute and agree to the terms of this General Release Agreement, as set out in the above paragraphs, freely and voluntarily.

## PLEASE READ CAREFULLY BEFORE SIGNING.

By signing the General Release Agreement, you surrender any legal claims against the Company. You should read the Release carefully before signing it. Because important legal rights are involved, the Company encourages you to consult with your own attorney before signing the Release.

Signature _____

Print Name: _____

Date: _____

-3-

 GlaxoSmithKline

**DATE:** **10/1/01**

**TO:** Greg Thorpe  cc:Mike Bennett
Carrie Rubright

**FROM:** Pat Keith

**SUBJECT:** **VERBAL WARNING -**

*This memo is a written confirmation of the verbal warning you received informing you of required performance improvement and to outline specific steps to improve your performance. This letter will not be placed in your official employee file, unless you fail to improve your performance and receive additional discipline.*

As determined from our previous conversations specifically in March, August and most recently September. Your performance is unsatisfactory for the following reasons

- You have reacted inappropriately to constructive feedback from management. This has been done through e-mail, and voice mail. An example of this is your recent voice mails rebutting your ratings for teamwork that appeared on the Sept. 18 coaching report.
- You have had a negative attitude that has effected your team members in the territory. Your team members have shared that your overall attitude regarding the company has inhibited their ability to work with you. You have made numerous negative comments pertaining to your TSR counterpart (Ron Crews), in the presence of management.
- You have consistently challenged directives given from management, as well as questioning new programs, guidelines, etc. This has been done verbally, through e-mail, and voice mails. An example of this, is the March monthly report, in which you made negative comments about the new incentive compensation program that had not yet been rolled out. You also stated in your August monthly report that you see no value in the monthly report that is required.
- On March 2, 2001 you were advised that your negative reactions to situations, were not appropriate, and would not be tolerated, moving forward. You were informed that you are expected to have a positive attitude in your approach to your daily activities, as well as your interactions with peers, home office personnel, etc. You acknowledged that you did not react appropriately in either of the referenced situations, and that you were aware of the expectations of you as a sales representative in the new GSK.

The following outlines specific steps that are required and will be evaluated during your verbal warning period to measure your improvement.

1. You will exhibit a positive approach to your daily activities.
2. You will not send e-mails, or voice mails, rebutting directives from the company, or questioning incentive compensation programs, company guidelines/policies, etc.
3. You will make an effort to create a positive working relationship with all 3 of your team members. This will include no longer making negative comments toward your team members.
4. You will conduct yourself in a professional manner when dealing with GSK team members, as well as GSK customers.
5. You will discontinue making negative comments regarding the company. This will include incentive compensation plans, salary structures, guidelines, policies, directives, and personnel.

7AC 0000011

You have up to a maximum of 30 days to demonstrate immediate and sustained improvement. We will have a follow-up, evaluation meeting on or before _11/2/01_____. If there is no improvement or if your performance deteriorates at the end of this period, you may receive a written warning or be separated from employment. Should your performance improve and, at a later date, should the same or similar problem occur, the company may immediately place you on written warning or separate you from employment. I suggest you review the company's corrective action policy outlined on the GSK Intranet.

The issues outlined in this letter as well as in our performance discussions are confidential and should not be discussed with your peers or customers.

If you have any questions concerning this verbal warning, please feel free to discuss them with your Human Resource Manager, or me. Remember that the company maintains a confidential employee assistance plan and you are always able to discuss issues with their staff.

Greg, I want your commitment to put in the required time and effort to improve. This can not be a temporary improvement. Greg, you have my support and I will help in any way I can. I trust that you can improve your performance, and I look forward to a very productive working relationship.

Pat B. Keith


District Sales Manager

**Thorpe, Greg**

To:        ar40104@gsk.com
Subject:   RE: Your High Road Partner/WHO?

I have had some serious complaints, regarding my DM taking disciplinary action against me for refusing to participate in obvious violations of company policy regarding mainly, but not limited to speaker events/promotion etc.. These events _contine_ with no response whatsoever back to me from Human Resources, who has been given most of the material evidence (not all).
HR has most recently refused to respond to my latest grievance and request to view my file within the required 10 days(response time). They have violated every published policy in regards to the matter at hand. Initially Carrie Rubright was handling this-most recently I wrote to Cynthia Kelly with no response. Is HR responsible to anyone fror their own violations of published policy, if so to whom??. Please check this out, TAP Pharm, recently had to pay almost 1 billion dollars for similar conduct, yet this company will not even acknowledge my existence. My DM, Pat Keith has had full knowledge of the conduct, yet I was the one reprimanded by him for reporting it to him and refusing to participate. I suggest that someone inform me of the status of the matter. Cynthia Kelly now has the materials I sent in, and will get more if they wish to contact me per published policy.Thanks. After over two months with no response, and my reputation and employ at stake, I hope this can be referred to someone who has the ability to oversee HR. I have tried all I can to no avail.


Sincerely,

Greg Thorpe
1280 Painted Rocks Rd
Woodland Park Co. 80863
Sr. Exec. Sales Rep. (CNS)
719-687-7675


-----

From:      US Internal Communications
Sent:      Tuesday, December 11, 2001 8:20 AM
Subject:   Your High Road Partner

Dear Sales Colleagues:

The enclosed fact sheet, *Pharma Compliance: Your Partner on the High Road,* will introduce you to the newly created Pharma Compliance department. Pharma Compliance, which reports to me, was established in response to David Stout's "Taking the High Road" initiative, to make GlaxoSmithKline the leader for ethics and compliance in sales and marketing practices. Pharma Compliance is a resource to US Pharma to address potential policy compliance violations, and meet new requirements for independent audits of sample accountability under the Prescription Drug Marketing Act (PDMA).

Because of the heavy scrutiny the pharmaceutical industry faces, your management is determined to make GSK the leader for ethical promotional practices. That is the reason our Commercial Practices Policies regulate the use of promotional materials, activities with physicians such as advisory boards and speaker events, and prescription drug samples. These rules are your safe harbor -- they protect you and GSK. More important, it's the right thing to do.

7AC  0000013

Thorpe, Greg
_____

| | |
|---|---|
| From: | Rajaratnam. Arjun |
| Sent: | Wednesday, January 02, 2002 2:54 PM |
| To: | Thorpe, Greg W (US Sales) |
| Subject: | RE: Your High Road Partner/WHO? |

Dear Greg:

Sorry for the delay in acknowledging your note.  I had forwarded this to one of my staff to look into on December 13, but I fear the holidays will have delayed our progress. Once I have received information from the persons involved, we can determine the next steps to take based on facts.

Thank you for reporting this to me.

Arjun Rajaratnam
Compliance Officer - Global Pharmaceuticals
GlaxoSmithKline
Off. Ph.: 919-483-9938
Cel. Ph.: 919-389-6495
Fax Ph.: 919-483-8746

The information in, or attached to, this email is confidential and may be legally privileged or protected.  If you are not the intended recipient of this email, your access to the information in this email is unauthorized.  Any disclosure, copying, or distribution of this information, or any action that you take or do not take in reliance on this information, is prohibited and may be unlawful.  If you receive this email in error, please reply to the sender immediately to advise him of the error and then delete this email and any attachments to this email.

-----Original Message-----
| | |
|---|---|
| From: | Thorpe, Greg W (US Sales) [SMTP:GWT19309@GlaxoWellcome.com] |
| Sent: | Wednesday, December 12, 2001 9:33 AM |
| To: | Rajaratnam. Arjun |
| Subject: | RE: Your High Road Partner/WHO? |

Dear Mr. Rajaratnam.

    I have had some serious complaints, regarding my DM taking disciplinary action against me for refusing to participate in obvious violations of company policy regarding mainly, but not limited to speaker events/promotion etc.. These events contine with no response whatsoever back to me from Human Resources, who has been given most of the material evidence (not all).
HR has most recently refused to respond to my latest grievance and request to view my file within the required 10 days(response time). They have violated every published policy in regards to the matter at hand. Initially Carrie Rubright was handling this-most recently I wrote to Cynthia Kelly with no response. Is HR responsible to anyone fror their own violations of published policy, if so to whom??. Please check this out, TAP Pharm. recently had to pay almost 1 billion dollars for similar conduct, yet this company will not even acknowledge my existence. My DM, Pat Keith has had

7AC  0000014

To Whom:
Re: Pharma Compliance Report 1/07/02

It is obvious to me prior to giving the information I am about to give that "retaliation" for informing certain individuals of severe violations of company policies has already begun. I have been given a "verbal warning" which is totally untrue, and does not follow company guidelines for disciplinary action. I have been ignored by Human Resources since July of 2001, regarding various requests for information. Most importantly they have even ignored letters from my attorney, and two other letters from me requesting appropriate action according to published guidelines and policies. I had to go all the way to the head of Pharma Compliance for any action. This matter has been ignored/covered up it seems by my District Manager, Pat Keith, Carrie Rubright and Cynthia Kelly in Human Resources, and Mike Bennett, Regional Vice President.

Regardless of what company policy may be, my letters to Human Resources and my previous complaints of misconduct have been quashed. My 23+ year career with this company has been trashed, and it is obvious that I can no longer work with my District Manager, or friends/counterparts just because I have come forward with the truth, which could save the reputation of GSK, and millions of dollars in fines. After investigating the TAP Pharm. issues and what we have here, possibly nationwide, I personally am extremely upset and angered at the indifference and pompous attitude of all of the above individuals, for ignoring my claims for over three months. The False Claims Act is no joking matter, nor a matter to be taken lightly, especially under the current attitudes regarding pharmaceutical companies in general.

This is not some minor violation of policy, the conduct I have attempted to report could result in severe legal and monetary penalties if left unchecked. I think that should be very evident and need no further explanation. I do not want to be the one responsible for a child's injury or worse because we PAID a physician, who wrote a book on ADHD, to tell others that Wellbutrin SR was a great drug for ADHD. Nor do I want to be responsible for paying a Nurse Practitioner to tell 200 others that Amerge is a great drug for Pediatric migraine. Further I will not take part in paying for an expensive lunch, and day at the SPA ($350) for 25 physicians and physicians assistants, just for listening to what they already know about Wellbutrin SR for 1/2 hour.

I also believe expensive programs now approved and pending by Pat Keith, DM- re: Ski bus trips to Breckenridge, Dinner and tickets to Avalanche games with a "guest" for physicians is no more than "buying the business through bribery." Is this the "high road"?

We have been told that "public perception" is everything now. Well just imagine the call I received ten minutes ago from a physicians assistant, not a physician, ordering

a 1) 65 minute deep tissue massage a 2) a 60 minute Colorado cleansing facial 3) a 30 minute foot reflexology and 4) a pedicure and French manicure. This would be after her "lunch at the Broadmoor" and 30 minute lecture by Brendan Montano, MD who flew in from Connecticut for several thousand dollars to talk about weight loss and the benefits of Wellbutrin SR!!!! I want to promote the benefits of my products, but this sickens even me. Can you imagine if the Wall Street Journal got a copy of this invitation, it would make the "dine and dash" look like a walk in the park.

All of the above has been approved by my District Manager Pat Keith, who disciplined ME for refusing to participate in a lecture by Paul Wender MD, who came here as he seemingly has all over the US to promote Wellbutrin SR for ADHD, as well as his own book.

I am not the one to determine what disciplinary action should be taken for these repeated violations of clear company policies and FDA law, among others. It is clear to me what needs to be done, however. Further retaliation by Pat Keith or the others mentioned is, it seems to me inevitable. How could one work for a DM such as this after reporting his repeated proven misconduct?

The question for me is, what now? I have not taken the advice of my attorney, to become a whistleblower and go to Federal Court. I do not want a $77 million whistleblower payment, like former TAP salesperson Douglas Durand received. I do want, however my reputation restored and those responsible for KNOWINGLY violating company policy or failing to report it held responsible. I would consider a severance/retirement plan *appropriate* for the losses I have suffered to date and will suffer if I am forced to work for Pat Keith or find other employ at my age. The inconsideration and violation of published policy by those in Human Resources have also contributed to the seemingly rapid demise of my career with this company for reporting wrongdoing. My wife and 4 children are my first and only concern after reporting these violations, and I would hope for a fair and logical treatment without resorting to any court actions. My previous complaints, gone unheeded are very clear in my attorneys letters to HR followed by my own letters.

In a letter dated 7/1/01 from David Stout, "Compliance with these policies is mandatory.....managers will be held accountable for ensuring all employees are trained on and comply with these policies. He further states in a letter dated 10/26/01, "all of you have completed your training on the new policies....but to demonstrate our leadership, policies are not enough. We must ensure we are following the policies as well through compliance. It shows we "walk the talk" by having policies and checking to see that they are being followed....positive documentation of our commitment to the high road. *JP, Bob and I are fully behind a strong compliance program-it's good for patients, it's good for each of us, and it's good for our profitability and reputation.*

The most recent message from Arjun Rajaratnum among other things specifically states... These policies reflect how GSK sales representatives must conduct their

business, and underscore the fact that GSK sales representatives are professionals, not *ENTERTAINERS* or *CATERERS*. That's why lavish meals, extravagant events and "Dine and Dash" are not acceptable. Your strict compliance with these policies shows that GSK is really on the HIGH ROAD.

Finally, I assume JP Garnier means what he says when he states, "Conducting our business with honesty and integrity is paramount. It is every employee's responsibility."

No one is above the laws established by the PDMA and FDA, or very clear company policy. This includes DM's who knowingly violate company policy, and RSD's, and HR personnel who ignore it when it is reported to them. I have not reported anything that I cannot document, nor anything trivial. I have put everything on the line, hoping for fair results. We shall see I suppose what the "high road" is and what "walk the talk" really means. Thanks for your time and efforts.

Sincerely,

Greg Thorpe

Sr. Executive Sales Rep.

## 1. PAID FOR LECTURE ON ADHD BY FRED MICHEL MD , CHILD PSYCHIATRIST.

--Pat Keith visited Dr. Michel with new rep., Anne Cutter, and advised her to set up a lecture on ADHD since Dr. Michel was such a strong promoter of the drug for ADHD.

-I told Anne that this was not only against company policy but, against FDA policy on drug promotion off-label.

-Anne told me that Pat was informed and insisted that she get the lecture going without me since now it had become her main produt.

-Anne proceeded with the lecture, I refused to attend or participate in any way. Pat was irritated at me but I told him I called the speakers bureau to see if it was ok-of course they said no. I believe this was submitted as a "depression lecture".

-This was a child psych. 90% children under 18 years. Wellbutrin not approved under 18, nor approved for ADHD.

-Anne notes attached, "did program at pikes peak mental health for kids with add and adhd good talk wbsr (Wellbutrin SR) 60 docs and therapists attended will see results from this.

**2. PAID FOR LECTURE BY PAUL WENDER MD. WHO WROTE BOOK ON ADHD. THIS WAS A LECTURE ON ADHD REQUESTED BY FRED MICHEL MD, AT PIKES PEAK MENTAL HEALTH CENTER.**

-RonCrews recruited Dr. Wender and approached me to set him up at Pikes Peak Mental Health Center for a lecture on ADHD, showed me his book that he wrote on ADHD.

-I called speakers bureau again to see if policy that was written or laws on promotion had changed, they said no.

- I told Ron I would not participate in paying Dr. Wender to speak off  label about children .  Ron told me it would be no problem, he would write up the lecture as a "depression talk".

- Ron went to Pat Keith telling him that I would not participate in bringing in this high profile speaker. He told Pat that he would write up the lecture as a "depression" lecture so it would go through.

- Pat came to me and lectured me for not being a "team player", but said that if I would not do it., he would get AnneCutter and Blair Hamrick to participate

- I told Blair Hamrick (now a respiratory rep. , Barb Curtin mgr. )not to have any part in the lecture. Pat told him to participate, he did not attend. <u>Blair may be contacted to confirm all of the above as the truth. He remembers it very well.</u>

- Pat Keith paid for ½ the lecture through our District funds and had Anne Cutter attend.

- All physicians who attended related it was a ADHD and some BIPOLAR lecture. Wellbutrin approved for neither.

## 3. PAID FOR LECTURE BY FRED MICHEL MD TO TALK TO MAINLY PEDIATRIC PSYCHIATRISTS ON IT'S USE IN CHILDREN WITH ADHD.

-notes indicate by Ron Crews that he recruited pediatric psych's to attend lecture on ADHD in children by Fred Michel MD.

-this was AFTER I had reported violations to Pat Keith, Mike Bennett, and Human Resources

- I was on medical leave for foot surgery at this time and did not know about it.

- Pat Keith approved this lecture AGAIN after I had already reported the violation of promotional practices. (ADHD in children)

- Anne Cutter also attended this lecture knowing full well that it was illegal.

- Notes show that this was an ADD lecture set up for Pediatric Psych's

- This indicates further repeated violations of company policy and federal law after I had pointed it out to many individuals, and was disciplined for lack of teamwork and criticizing Ron Crews. Pat was totally aware that Ron was again going to turn this in as a "depression lecture"

- Anne Cutters own NOTES state "did night program great disc. Wbsr (Wellbtrin SR) use for add"

- Keith continues to violate all aspects of legal promotion after being turned in.

**6.  I CAME BACK TO WORK FROM MEDICAL LEAVE FOR SURGERY ON 1/2/02. ANNE CUTTER CALLED ME TO MEET ME ON 1/3/02 BECAUSE SHE WAS GOING ON VACATION AND PAT WANTED ME TO TAKE OVER A PROGRAM THEY HAD INITIATED. THIS WAS A PRIDE PROGRAM. PAT KEITH HAD APPROVED THIS PROGRAM. I ASKED ANNIE HOW MUCH IT COST, (SEE ATTACHED SELF MADE INVITATION) AND SHE SAID ABOUT $350 PER PERSON PLUS GRATUITIES. I REPLIED THAT WE COULD NOT SPEND THAT MUCH ON ANY INDIVIDUAL PER COMPANY GUIDELINES. THE GUIDELINES CALLED FOR A $75-125 MAXIMIUM, AND THE $125 WAS FOR A HIGH COST AREA, LIKE NEW YORK CITY.**

ANNE SPECIFICALLY TOLD ME THAT PAT KEITH APPROVED THAT AMOUNT BECAUSE ALTHOUGH IT WAS PAID FOR BY MARKETING, AN "OUTSIDE VENDOR" WOULD PAY DIRECTLY, SOTHAT "IT SHOULD NOT BE NOTICED ON OUR EXPENSES."

    A. YOU CANNOT CREATE YOUR OWN INVITATIONS, SCS HEALTHCARE MARKETING IS TO DO THAT, AFTER BEING APPROVED BY LEGAL. PAT KEITH ALSO SAW THE INVITATION THAT ANNE HAD CREATED. SEE ATTACHED CALL REPORT TO H.B. CRANDALL, WHO CONFIRMED WITH PAT PRESENT ON 11/29/01. INVITATION IS ATTACHED. (WHAT CAN A COMPETITOR OR ANYONE DO WITH THAT, ESPECIALLY THE MEDIA?) INCREDIBLE.

    B. PAGE TWO OF THE "PRIDE PROGRAM" GUIDELINES STATES "...GSK HAS NEW COMMERCIAL POLICIES THAT IMPACT YOUR ACTIVITY IN THE FIELD, AND THUS IMPACTACTIVITY RELATED TO PRIDE PROGRAMS. FOR EXAMPLE, THE POLICY ON ENTERTAINMENT OF AND GIFTS TO HEALTHCARE PROFESSIONALS, OUTLINES THE CRITERIA FOR GIVING GIFTS AND *PROVIDING ENTERTAINMENT* . PLEASE TALK TO YOUR MANAGER BEFORE ARRANGING SUCH ACTIVITIES...RECREATIONAL ACTIVITY AS YOU PLAN AND IMPLEMENT PRIDE PROGRAMS....THE EVENT AND DESCRIPTION MUST BE APPROVED BY YOUR MANAGER.

    C. PAGE 9 STATES "ALL RECREATIONAL ACTIVITIES MUST BE APPROVED BY YOUR DISTRICT MANAGER.....YOU ARE RESPONSIBLE FOR COMPLIANCE WITH GSK'S POLICIES RELATED TO RECREATIONAL ACTIVITIES."

    D. "TARGET AUDIENCE IS TO BE HIGH PRESCRIBING 7-10 DECILE PRIMARY CARE PHYSICIANS AND PSYCHIATRISTS"  AT THE POINT I RECEIVED THE PROGRAM, AND UNTIL THIS DATE 8 PHYSICIANS, 7 PHYS ASST'S, AND 2 N P'S HAVE COMMITTED.

ONLY 6 OF THESE 17 WOULD BE CONSIDERED AS ANY
SIGNIFICANT PRESCRIBER.

I APPROACHED ANNIE ON ALL OF THESE POINTS AND SHE SAID THAT
PAT WAS AWARE OF EVERYTHING AND I SHOULD BE A TEAM PLAYER
AND HELP HER OUT.

ATTACHED ARE:

INVITATIONS DELIVERED
FIELD CONTACT REPORT THAT SHOWS PAT KEITH PRESENT FOR
PRESENTING AN INVITATION.
A LIST OF ATTENDEES PREPARED BY ANNIE, AND SOME THAT
RSVP'D TO ME WITH THEIR CHOICE OF 3-4 SPA TREATMENTS,
RANGING IN PRICE FROM $270-$320 PLUS GRATUITY. THE MEAL IS
ABOUT $50 EACH AT THE BROADMMOOR.


THIS IS WHAT I CAME BACK TO MY SECOND DAY OFF OF MEDICAL
LEAVE. I AM TO BE EVALUATED BY PAT KEITH ON 1/30/02 FOR MY
PROGRESS ON "TEAMWORK". AS BEFORE AND RELATED TO HUMAN
RESOURCES, I WILL NOT ENGAGE IN TEAMWORK THAT INVOLVES
ILLEGAL ACTIVITIES. I WOULD REQUEST A SHORT "ADMINISTRATIVE
LEAVE OF ABSENCE" UNTIL THIS MATTER IS QUICKLY RESOLVED. I
CANNOT AND WILL NOT BE HARASSED, INTIMIDATED, AND MALIGNED
BY THIS MANAGER ANY FURTHER. THIS MATTER IS SERIOUS, SHOULD
BE RESOLVED QUICKLY, AS ONE OF MY MALE PHYSICIANS ASKED ME
WHY I CAN'T TAKE HIM BIRD HUNTING ($75) ANYMORE, WHEN THE
WOMEN PHYSICIANS GET THE "SPA TREATMENT". THIS COULD
QUICKLY BECOME A FINANCIAL AND REPUTATIONAL ISSUE IF NOT
IMMEDIATELY RESOLVED. I WILL NOT PARTICIPATE, NOR WILL I
SHOULDER ANY BLAME.

7.)   KNOWN PENDING PROGRAMS APPROVED BY PAT KEITH THAT MAY NOT COMPLY WITH GUIDELINES EITHER ETHICALLY OR COSTWISE.

- "SKI BUS TRIPS TO BRECKENRIDGE COLORADO

    - RON CREWS  1/19/02  PRIDE PROGRAM

    - -KAA KILPATRICK 2/9/02  PRIDE PROGRAM

- AVALANCHE HOCKEY GAME WITH DINNER AND "GUEST"

        - 1/15/02

        - 2/9/02

8)   OTHER KNOWN PROBLEMS APPROVED BY  PAT KEITH SUBJECT TO AUDIT .

-ANNE CUTTER TOOK DR. PATRICIA FODOR TO THE SPA FOR AN ENTIRE AFTERNOON ON 1/3/02 APP. COST $500-$600 .  DR. FODOR IS AGAIN BEING TREATED TO A $300 SPA TREATMENT ON JANUARY 18TH AT THE SPA PROGRAM (PRIDE).

ANNE HAS SCHEDULED HER OWN SPA TREATMENT WITH THE KNOWLEDGE AND CONSENT OF PAT KEITH, AFTER THE LUNCHEON LECTURE ON 1/18/02 AT THE EXPENSE OF GSK, AS SHE HAS DONE BEFORE. SPA TREATMENTS ARE INDIVIDUALLY DONE, THERFORE NO INTERACTION WITH PHYSICANS WOULD BE AVAILABLE TO ANY EXTENT.

ANNE CUTTER SHOULD NOT BE THE "VILLAIN" HERE, SHE IS FOLLOWING THE RECOMMENDATIONS AND APPROVALS GIVEN TO HER BY PAT KEITH. THIS SHOULD ALL BE PAT KEITH'S RESPONSIBILITY AS THE DISTRICT MANAGER IN CHARGE, NOT ANNE CUTTER'S.

# PLEASE JOIN US FOR A PRESENTATION ON

## "ISSUES IN THE MANAGEMENT OF DEPPRESSION"

PRESENTED BY BRENDAN MONTANO, MD
AT THE GOLF CLUB AT THE BROADMOOR

THE DISCUSSION AND LUNCH WILL BEGIN
AT 12:30PM IN THE PALMER ROOM
FOLLOWED BY A WONDERFUL AFTERNOON AT THE SPA

PLEASE CHOOSE EITHER ONE TREATMENT FROM LIST A
AND TWO FROM LIST B *OR* TWO FROM LIST A *OR* <u>THREE</u>
FROM LIST B

***PLEASE RSVP WITH YOUR SELECTIONS TO ME NO
LATER THAN JANUARY 2ND***

ANNE CUTTER
651-9308

A List
1. 50 min Swedish massage
2. 50 min. shiatsu massage
3. 50 min. aeromatherapy massage
4. 65 min deep tissue massage
5. hot stone therapy massage
6. prenatal massage 50 min
7. freshness treatment for legs
8. Golden glow body polish
9. Colorado cleansing facial 60 min
10. Celex C facial
11. Immuniscience institute treatment
12. Lift Defense institute treatment
13. Oxydermin institute treatment
14. Broadmoor Mud wrap
15. Paraffin body moisturizing wrap
16. Thalassoslim treatment
17. Detoxifying Treatment
18. Remineralizing Treatment
19. Jin Shin Jyutsu 30 min
20. Reiki 45 min

B List
1. 30 min Swedish massage
2. 30 min sports massage
3. 30 min aeromatherapy massage
4. Foot reflexology 30 min
5. Herbal wrap
6. Salt Glow Loofah
7. Personal trainer 50 min
8. Mini facial
9. Bath of Choice
10. Manicure
11. Pedicure
12. French Manicure
13. Buff and Polish
14. Contour Eye treatment

You are cordially invited to attend a thought
leader presentation entitled:

## "Options for the Primary Care Treatment of Depression"

Presented by Brendan Montano, MD

*Sponsored by GlaxoSmithKline*

**Date: Saturday, January 19, 2002**
**Time: 6:00 AM**

**Meeting Place:**
**Parking Lot at 555 South 8th Street**
**Colorado Springs, CO**
**(West of Hobby Lobby)**

A charter bus will be waiting to bring you to
Breckenridge Ski Resort
for an afternoon on the slopes

Please RSVP to your GlaxoSmithKline
representative, Ron Crews,
by Saturday, January 12, 2002 at 719-481-0958.

©2001 GlaxoSmithKline Group of Companies
All rights reserved  Printed in USA  January 2001

7AC  0000025

## Speakers Program Summary Report

District: B4ET **Territory:** B4EN15 - Thorpe, Gregory

# University of Colorado Health Sciences Center

| Pgm Status: | SE: Closed | Pgm Num: | 351323 | Note: |
|---|---|---|---|---|
| Date Range: | 07/13/2001 - 07/13/2001 | Estimated Exp: | $ 1,420.00 | Speaker to be sponsored at National Primary Care Nurse Symposium at Keystone Resort in Keystone, Colorado JUly 12-14, 2001 |
| Modified: | 9/14/2001 | Actual Exp: | $ 750.00 | |
| Init Terr: | B4EN15 - THORPE, GREGORY | Est Attendee: | 200 | |
| Routing: | None | | | |

## Treatment of Pediatric Migraines

Edu. Comp. Type : Lecture
Date and Time: 07/13/2001  4:00:00PM
Location: Keystone Resort, Aurora, CO

**Speaker(s)**
Anna-Liisa Vockell

**Product(s)**
AMERGE

| Speaker Name | Content | Skills | Knowledge | Feed back | Product balance |
|---|---|---|---|---|---|
| Anna-Liisa Vockell | Excellent | Good | Excellent | Good | Excellent |

## Invitees

## Attendees
Non Profiled Attendees 0

## No Group Meals

## No Outside Events

## Speaker Expenses

| Speaker | # Lecs | Override Justification | Apvd Hnrm. | Payee | Est Spk Exp | Payee(s) |
|---|---|---|---|---|---|---|
| Anna-Liisa Vockell | 1 | | $750.00 | Anna-Liisa Vockell | $670.00 | Anna-Liisa Vockell |

Note: This information is highly confidential and not to be discussed with anyone outside of GlaxoSmithKline, Inc.

PROGSUMM RPT

7AC  0000026

University of Colorado Health Sciences Center

District: B4ET  Territory: B4EN15 - Thorpe, Gregory

Speakers Program Summary Report

Print Date: 01/04/02
Print Time: 1:13:36PM
Page 2 of 2

## Cost Allocation

| Terr B4EN12 | Rep Name DRAKE, WINONA | Amount 100.00 | Overflow N/A |
|---|---|---|---|

## No Miscellaneous Expenses

## Actual Costs

| Description | Actual Cost |
|---|---|
| Speakers' Honorariums | |
| Speakers' Expenses | $750.00 |

Note: This Information is highly confidential and not to be discussed with anyone outside of GlaxoSmithKline, Inc.

PROGSUMM.RPT

7AC  0000027

From
Greg Harper

①

To   1 of 2                                          1/16/02
Teri Schaffer          FYI

— Teri, please find attached
E mail received from Pat Keith
on 1/14/02. As stated he has 4
club level seats that he was
again personally going to use for
his wife & 2 children, while physicians
sat up high with their guests. Bill
Sudmeier informed me of this yesterday.
He got caught & bailed out, but has
done this all year, at company expense.
— I got a call from a phys. asst.
that the Spa meeting was cancelled 1/18.
I had calls in to Anne Cutter about
this matters and have not heard from
her. What do I tell her?

— I fractured my R. ankle on Sat.,
and have to have a walking cast put
on Fri., So i am on crutches until
then. I will be working Fri after
cast is on. You may call me at
home at your convenience.   Sincerely
Greg Harper

7AC 0000028

## Thorpe, Greg

From:      Keith, Pat
Sent:      Monday, January 14, 2002 8:47 AM
To:        'Basler, Ingrid'; 'Beaudoin, Denise'; 'Burke, Kathleen'; 'Butler, James'; 'Crews, Ron'; 'Cutter, Anne'; 'Dooley, Chris'; 'Hosler, Betty Lozier'; 'Kilpatrick, Kaa'; 'Schrader, Erin'; 'Sudmeier, Bill'; 'Thorpe, Greg'; 'Todd, Roberta'; 'Vasquez, Ben'
Subject:   Program guidelines

As we move into the heart of our PRIDE, and FIRST program season, I wanted to make sure everyone is clear on the direction regarding attendees. We have covered this issue on numerous occasions, but it is critical that we follow the guideline. *We do not invite guests to programs. If a prescriber attends a program that you are responsible for with a guest, you need to be certain that this is the only way that they would attend.* I realize that this presents a definite challenge, but this is our policy. Let's make sure that it is always followed. These programs are a huge opportunity for driving our business, and we need to make sure that they are done the right way. I look forward to hearing about the many successes that will come from these programs in 2002. Take care.

*Pat Keith*
*District Sales Manager-CNS*
*Southern Colorado District*
*303-805-9280*



GlaxoSmithKline

April 19, 2002

Via Facsimile and
Regular U.S. Mail

**GlaxoSmithKline**
PO Box 13398
Five Moore Drive
Research Triangle Park
North Carolina 27709-3398

Tel: 919.483.2100
www.gsk.com

Keith Cross, Esq.
108 East St. Vrain, Suite 20
Colorado Springs, CO  80903

      Re:   Greg Thorpe

Dear Mr. Cross:

      I have had the opportunity to review with my client, your correspondence of March 22, 2002, where you requested substantial enhancement to the offer of severance previously extended to Mr. Thorpe. Based on the internal review of all information related to Mr. Thorpe's situation, we do not agree with your assertion that his return to work under the management of Mr. Keith is "untenable", and therefore find your request for additional monies to be unreasonable.

      The Company is confident that all matters brought to our attention by Mr. Thorpe have been fairly evaluated and appropriately addressed. Additionally, Company policy does not permit retaliation against an employee who has complained, and all efforts will be taken to ensure that Mr. Thorpe is protected from such behavior. The Human Resources and management team remains committed and ready to work with Mr. Thorpe in moving forward in a positive manner as soon as possible.

      To that end, we are asking Mr. Thorpe to decide as soon as possible whether he will return to work or resign from employment with GSK with a severance package. If Mr. Thorpe decides to return to work, he will be expected to begin actively working on Monday, April 29, 2002. If he decides that he would rather resign from employment with GSK, then we are willing to provide a severance package in exchange for a signed release of claims. Although we are not willing to provide the additional enhancements Mr. Thorpe has requested, we would like to reiterate our original offer plus the following:

a.    **Relocation expenses**. Since Mr. Thorpe has expressed an interest in relocating back to Arkansas to be near family, the Company will provide reimbursement for relocation expenses up to $ 80,000.00.

b.    **Vehicle purchase**. Additional lump sum equivalent to $11,000.00 to assist in the purchase of his current Company-issued vehicle.

7AC  0000030

Case 1:11-cv-10398-RWZ Document 133 Filed 02/15/12 Page 31 of 42

The modifications discussed and agreed to above will be incorporated a Separation Agreement, which I will forward for your review once I have received written notice of Mr. Thorpe's intent to resign. We consider the offer of severance, which far exceeds what other voluntary leavers are provided, to be extremely generous. Therefore, please consider this to be our final offer. I would appreciate receiving your written notice of Mr. Thorpe's decision no later than close of business on Friday, April 26, 2002.

Sincerely,

Belinda Reed Shannon

Cc: Carrie Rubright


APR 26 2002

7AC 0000031

Belinda Reed Shannon
GlaxoSmithKline
Five Moore Drive
Research Triangle Park
North Carolina 27709

6/5/02

$\pi AY\ 719 - 633 - 5788$

Re: Letter of 4/22/02 from Keith Cross, Esq.

Dear Ms. Reed Shannon:

My attorney wrote you on 4/22/02 to comply with your imposed "deadline" of 4/29/02. We have not received a reply to date, over 6 weeks later.

I have been handcuffed to my home, essentially for the last several months on administrative leave and continue to experience harassment, discrimination and further retaliation for bringing to the company's attention, several illegal activities.

In the last month, due in part to your delays, my reputation in the medical community, and with all other sales representatives has further deteriorated due to the continued defamation and retaliation from Pat Keith, my former District manager.

I am moving from the area, because I am the one blamed for all the new policies regarding entertainment, etc. This was "damage control" by legal, and nothing proactive regarding a "high road" as you know.

I am being forced to move from the area because nobody will hire me here, not to be near my parents. Physicians as well as representatives from other companies think they know exactly what has gone on because of continuing defamation from the criminals that I turned in, (Pat Keith, Anne Cutter, and Ron Crews).

Although I will have to sign whatever release you send me this is a "settlement" not a resignation. I accepted a minimal "package" compared to what I could get in Court, yet you still fail to follow through and cause me further hardship, embarrassment, and loss of any future employ with any other drug firm in the community. This is retaliation at it's worst.

I have spent thousands in legal fees thus far. I have repeatedly asked to see my file, which is my right as an employee, and have been <u>denied</u> the right, for whatever reason. It is time for a solution, period.
*I received, after months of harassment, a package as of 2/26/02 figures*:
-2 months notice pay (upon formal notice, not yet given)
-Cash Balance Plan Enhancement of $117,312.46
-Severance pay of $129,759.94
-Medical and dental due me re: rule of 75 at what cost?

7AC 0000032

In your letter, you graciously added:

-$80,000 in relocation expenses, so I could go somewhere to get a job in the field I have chosen for 27 years. We asked for clarification of this to no avail.

-$11,000 towards the purchase of the company vehicle.

Due to the retaliation I have suffered, my home is under contract at a loss. I still have nowhere to go yet, and my children will have to leave their friends. This has occurred only because I turned in liars, thieves and potential felons, whom you still employ.

My career has been ruined, I have to sell a home we love, and my kids are in turmoil. I expect an immediate reply to my attorney's letter, with answers to his questions and updated severance figures, so that I may proceed in the best manner possible with my life, in my families interest.

Sincerely,

Greg Thorpe

Cc. Keith Cross



GlaxoSmithKline

September 11, 2002

**GlaxoSmithKline**
PO Box 13398
Five Moore Drive
Research Triangle Park
North Carolina 27709-3398

Tel. 919 483 2100
www.gsk.com

Via Express Mail

Keith Cross, Esq.
108 East St. Vrain, Suite 20
Colorado Springs, CO 80903

      Re:    Greg Thorpe

Dear Mr. Cross:

In furtherance of the terms set forth in the severance agreement and release between GSK and Mr. Thorpe, I am forwarding correspondence and reimbursement checks related to his relocation activity.

He has sent a large amount of documentation related to temporary living and relocation expenses, all of which may not be reimbursable. We nevertheless, have sent him funds based on the average amounts typically made available to relocating employees. Those amounts are explained in detail in the accompanying documentation. We will continue to review the documentation he has provided and make any additional reimbursements related to expenses that fall within the relocation guidelines.

Mr. Thorpe's termination from GSK occurred on August 31, 2002 and he should soon be receiving the severance checks and other benefits indicated on the Personal Benefits Statement he received.

I would appreciate it if you or Mr. Thorpe would indicate a home address in Arkansas that can be used for future correspondence. Otherwise, I will continue to forward all correspondence and relocation reimbursements to your attention for safe passage on to Mr. Thorpe.

Please call me directly with any questions or concerns you may have regarding this matter.

Sincerely,

Belinda Reed Shannon

SEP 1 2 2002



**GlaxoSmithKline**
PO Box 13398
Five Moore Drive
Research Triangle Park
North Carolina 27709-3398

Tel. 919 483 2100
www.gsk.com

September 11, 2002

Dear Mr. Thorpe:

The company received your signed general release, and proceeded with processing of your severance payments and related benefits immediately after the 7-day revocation ended without your revoking the agreement. In conjunction with that, your termination from employment with GSK has been processed (effective August 31, 2002), and you should soon be receiving the severance payments indicated on your Personal Benefits Statement.

We have also received the relocation documentation you have forwarded for reimbursement. As a reminder, the Company has only agreed to reimburse relocation expenses similar to those covered under the GSK relocation programs. We have not yet completed full review of the numerous receipts you have already submitted to determine which are eligible for reimbursement. Nevertheless, I have arranged for several checks to be provided to you (enclosed), as reimbursement based upon the approximate amounts typically provided by GSK to relocating employees.

The following information describes the list of relocation related expenses that are typically reimbursed by the Company, and other important information regarding the tax treatment of these covered reimbursements.

### DEFINITIONS

"Family" includes your spouse, children, parents or other dependents living with you.

"Home" means your permanent place of residence. It does not include a second house or apartment.

"Household Goods" includes the entire contents of your house. In addition, the following are included: jungle gyms; garden equipment; small pets (cats, dogs, etc.).

Examples of items not included are horses or livestock, boats, campers or house trailers, and firewood. It is recommended that boats, campers or house trailers be hooked up to your car and hauled to the new location.

### 1.    Home Sale Program

Normal and customary sellers' closing costs and a real estate commission of 6% are paid by GlaxoSmithKline.

7AC  0000035

## 2.    House Hunting

The house hunting trip is *limited* to the employee and spouse.  Expenses covered under this allowance include airfare/mileage, car rental, babysitting, lodging and meals for a maximum of 4 nights, 5 days.

## 3.    Temporary Living Expenses

If your start date in the new location occurs before your family moves, you will be provided with a lump-sum payment for temporary living expenses incurred while working in the new location for a period of up to two months.

## 4.    Closing Costs – New Home

The Company will reimburse you for costs associated with the purchase of a new home.

- Mortgage application fee
- Title insurance
- Loan origination fee/point(s) (see end of this section for details)
- Attorney's fees (up to $750)
- Credit report (if required)
- Survey fees (if required)
- Abstract fees
- Owner's title insurance premium (provided the premium is not paid by the seller and abstract of title is not furnished).  Normally the charges are split 50/50.
- Notary fees
- Transfer fees
- Recording fees
- Termite inspection (if required)
- Home inspection

In addition to the documented expenses listed for reimbursement, *mortgage procurement points* will be reimbursed according to the following sliding scale method:

8% or lower        1% Origination Fee / 0% Discount Points

## 5.    Final Move Expenses

- *Interim Living Expenses at the Time of your Move*

    After your household goods have been moved from the old location and before they arrive at the new location, you will be allowed *up to 15 days* living expenses (for you and your family) in the old location, en route, or in the new location.  This includes expenses such as lodging, meals, laundry, transportation, etc., and must be accompanied by original receipts.

7AC  0000036

- *Direct Transportation*

  The Company will pay for transportation by the most direct route for your and your family to travel to the new location. The policy provides for coach airfare for each member of the family. However, you may wish to use other means of transportation, such as driving your car. In this case, the Company will pay the current mileage allowance plus tolls and living expenses (room and board while en route). Total expenses are not to exceed coach airfare costs and estimated car transport costs. Receipts are required.

- *Shipment of Household Goods*

  Household moving expenses paid by the Company include charges for packing, transportation, replacement value insurance, unpacking and storage for *up to 30 days*. GlaxoSmithKline will not authorize packing, loading/unloading on weekends, which would create overtime expenses.

- *Transportation of Pets*

  Cost for the transportation of up to two pets, no larger than a dog, to the new location will be reimbursed only if it is impossible for you to transport such pets along with the family by automobile during the final move. Health certificates, inoculations, licenses, pet carriers, permits and other miscellaneous expenses, such as kennel charges, are not reimbursable. Monies paid by you for miscellaneous per expenses should be considered part of the Relocation Allowance.

## 6.     Incidental Relocation Expense Allowance

The Company will pay you an amount equal to 7% of your new annual base salary to assist with incidental expenses not specifically covered by the policy (i.e., additional storage, carpets, tips to movers, car registration, cleaning of new residence, utilities deposit, etc..). This payment is initiated after your effective date in your new position. This payment is tax protected.

### Income Taxes

It's important that you be aware of the tax implications of relocation. It is suggested that you consult your personal tax advisor regarding your particular situation.

Relocation payments made by the Company are considered additional compensation that must be included in your gross income. This additional compensation is subject to income tax and FICA withholding and is reflected in your annual W-2 (Withholding Tax Statement) form. Some payments are not subject to withholding and are deductible. The Company will provide an annual breakdown of reimbursed relocation expenses. You may find the proper tax forms and instructions on our Relocation website.

### Items Not Subject to Income Tax Protection

Because everyone's personal financial and tax situations are unique, the Company cannot provide individual tax and/or financial planning advice. If you are facing a tax

7AC  0000037

issue, you should consider discussing the matter with your tax advisor to develop an approach that is appropriate for you and your family.

The following Company payments will not be tax protected, as they are either excludable from income, deductible, or a taxable bonus.

- Household goods shipment (excludable)
- Mortgage points (deductible)

You will find enclosed, a total of three separate checks, which are broken down as follows:

a. **$27,650** for covered expenses related to home sale, temporary living, incidental allowance, house hunting, and meals from your final move trip. All of these expenses are taxable, and the Company has grossed up your payment for to cover the applicable taxes.

b. **$8,600** for shipment of household goods and the travel and lodging expenses related to your final move trip. These expenses represent non-taxable items.

c. **$6,000** for allowable expenses related to the purchase of your new home. These expenses are deductible on your federal income tax and have therefore, only been grossed up to cover the applicable FICA and Medicare taxes.

As I noted earlier, we have not yet reviewed all of the receipts you have turned in for reimbursement to verify that all are appropriate for reimbursement under the agreement. The amounts you have been forwarded are based on averages typically incurred by relocating employees. If you believe that there are additional monies owed, please provide details of your request in writing to me so that we can reconcile with the guidelines noted above, as well as the amounts provided in this correspondence. In the meantime, we will continue to review the receipts you have already presented for reimbursement and will make necessary adjustments where we have fallen short with respect to eligible expenses.

Lastly, although the Company offered to provide you with a lump sum payment of $11,000 to assist in the purchase of your Company-issued vehicle, I have been notified that you declined to do so and instead returned the vehicle to the Company during your check-out. Therefore, the Company will not be forwarding the $11,000 noted in your agreement.

It is our hope that you will find this information and corresponding payments to be sufficient evidence of the Company's intent to follow-through on the terms of the separation agreement. Please direct any remaining requests or questions to my attention.

Regards,

Belinda Shannon
Asst. General Counsel

Page 4

7AC 0000038

Belinda Shannon                                                    11/15/02
5 Moore Drive
Research Triangle Park, N.C.
           27709

Dear Ms. Shannon,

Attached are two e-mails that were sent to you outlining what GSK owed
me to deter a *__wrongful termination suit__*. Two months have passed with no
response so I can only assume that you did not receive copies of the e-mails
to my attorney, Keith Cross.

The document I signed regarding not suing for wrongful termination is not
valid until GSK complies with the terms of the agreement as I have.

You owe me:

1. $11,000 for the purchase of a vehicle, as you refused to give me the price
of the company car OR the company car to use the $11,000 towards it's
purchase.

2. Bonus for the period ending August 31, 2002. (JUNE, JULY, AUGUST)

3. A minimum of $15,000 in relocation expenses that have not been
reimbursed per company guidelines (supplied to me only AFTER I
relocated).
I am settling for this amount, as if the guidelines are applied it would be
more. You failed to even review my receipts, or give me other applicable
amounts as per the guidelines (read them).

4. $1,430.25 in unused vacation pay that was not supplied as promised.


I know that David Stout was aware and continues to be aware of the illegal,
immoral and unethical conduct I reported at GSK. I understand that he was
promoted, and while I wish him the best- he is just as responsible for
covering up all of the illegal conduct as the people who actually were
responsible, as are Arjun Rajaratnam, Chris Singer, Mike Bennett, Cynthia
Kelly, Carrie Rubright, Pat Keith, and others including yourself.

I am copying David Stout as well as Bob Ingram so that they are fully aware of your personal conduct.

I would hope that Bob Ingram, would look into this matter, if he has not already. The conduct at GSK, which I partially reported, as you know is ongoing. Although I was essentially terminated for reporting it and substantiating it with facts, it needs to be corrected, not brushed under the GSK carpet. My hopes are that Bob Ingram, who comes from my alma mater, Eastern Illinois University and is someone I have talked to before will in fact take the "high road" in the matter as all the others only purport to do.

I have been harassed and maligned for almost 1 1/2 years after a 24-year career with Glaxo, for doing the right thing. I have been denied access to my file, as is the published right of every employee, only because Human Resources does not even follow their published policies. As stated before Arjun Rajaratnam is only a puppet for the legal department. We obviously have no "compliance officer" with this company as far up as David Stout. Hopefully Bob Ingram will review the entire matter. If he already has, I suppose the buck stops with him.

Finally, and this time I mean FINALLY, you have 10 days to comply with the waiver I signed, or all legal action will be taken for ruining my career and violating the terms of the severance agreement.

Sincerely,

Greg Thorpe

Cc. Keith Cross, Esq.
    David Stout
    Bob Ingram
    Arjun Rajaratnam

# Blair C. Hamrick

## Profile

Energetic sales professional skilled in penetrating rapidly changing competitive markets
Expertise in launching new pharmaceutical products and increasing sales of current products
History of generating bottom line results with outstanding negotiation and closing skills
Eleven-year track record of revitalizing unproductive territories

## Accomplishments

- 1999 Presidents Trophy Winner, top 10% in the in Glaxo Wellcome Sales Force

- Appointed to FMT Program, 9/99

- Promoted to Therapeutic Area Specialist, 7/99

- Ranked #1 in region, #2 nationally for market share increase for all products, 12/93

- Promoted to Specialist Representative, 9/93

- Winner of three helping hand awards for team contribution, FY '92

- Rookie of the Year, 12/92

- Salesman of the Year, 12/90

7AC  0000041

Blair C. Hamrick
Page 2

# Employment History

Glaxo Wellcome Inc. 5 Moore Drive, Research Triangle Park, North Carolina 1997 to Present
**Burroughs Wellcome Division, and Therapeutic Area Specialist AI/GI Denver, Colorado**
Positioned outstanding Pharmaceutical products to 500+ physicians and hospitals.  Target specialties include:  General Practice, Family Practice, Pediatrics, Internal Medicine, Infectious Disease, OB/GYN, Neurology, and Emergency Medicine.

Norvartis Pharmaceuticals Corporation 59 Route 10 East Hanover New Jersey 1996 to 1997
**Mass Markets Sales Representative, Denver, Colorado**
Successfully marketed unique pharmaceutical products to 500+ physicians, hospitals and HMO's.  Target specialties include:  General Practice, Family Practice, Internal Medicine, OB/GYN, Geriatric Specialist, Rheumatology and Endocrinology.

Syntex Laboratories Inc.  3401 Hillview Avenue, Palo Alto, California          1991 to 1995
**Professional Medical Representative, Tampa, Florida and Denver, Colorado**
Marketed diverse pharmaceutical products to 400+ physicians, hospitals and HMO's.  Target specialties included:  General Practice, Family Practice, Neurology, Cardiology, Orthopedic Surgery, Internal Medicine, Otolaryngology, General Surgery, Vascular Surgery and Oral Surgery.

Lever Brothers Company 390 Park Avenue, New York, New York          1989 to 1991
**Territory Manager and Key Account Manager, Orlando, Florida**
Increased sales of consumer products to independent grocery wholesale buying cooperatives and Key Accounts.  Managed cooperative advertising budget.  Key Accounts included: Certified Grocers of Florida, Ocala, Florida, Gooding's Supermarkets, Altamonte Springs, Florida, Miller's Supermarkets, Crescent City, Florida.